First case for argument, United States v. Roy Franklin, et al. All right, Mr. Johnson, you may proceed when you are ready. May it please the Court? Good morning, Your Honors. My name is Justin Johnson, and I represent the appellant in this case, Mr. Roy Franklin, Jr. With limited time that we have divided up, there are two issues that I would prefer to focus on. Obviously, if the Court has questions on other issues, I will field those. The first is the Point 3, relating to the failure of the District Court to give an instruction on entrapment. And then, if I have time, I'd like to focus on Point 4, which relates to the use of acquitted conduct to sentence Mr. Franklin. As to Point 3, Your Honors, Mr. Franklin contends that the evidence was sufficient to find entrapment as it relates to conspiracy to distribute cocaine, which entitled Mr. Franklin to delivery of Eighth Circuit Model Jury Instruction 9.01. And in summary, our position is that this is an issue that should not have been removed from the hands of the jury by the District Court. That instruction should have been given. The standard of review is an abuse of discretion. United States v. Coleman out of the Eighth Circuit says that entrapment is a question of fact generally left to the jury. And the individual claiming entrapment must show that the government agents implanted the criminal design in his mind and induced him to commit the offense. And then the burden shifts to the prosecution to prove beyond a reasonable doubt that the defendant was predisposed to commit this crime. Counsel, I think the issue is the predisposition, right? The District Court found that your client was predisposed. Does it make a difference that the finding was predisposed to sell drugs as opposed to a specific drug? And if so, what case should I focus on for that distinction? Or is there another distinction that you find to be important? That is a distinction that is important in this case. And to be clear, the District Court did find that Mr. Franklin was predisposed to sell drugs and used that as justification for not delivering the instruction. It is our position that there is a principal distinction to be made very clearly between predisposition to sell marijuana or predisposition to sell your aunt's oxycodone pills versus much more serious crimes that Congress treats very differently. Well, here was the distinction between heroin and cocaine? Pardon me? Was the distinction here between heroin and cocaine, or am I confusing that? We only asked for the instruction, Judge, as it relates to cocaine. We did not ask for that instruction as it relates to heroin. And this is the reason why I picked this issue, Your Honors, is that there was a factual reason that I only asked for the entrapment instruction as to cocaine. There seemed to me to be clear evidence in the Instagram communications and the wiretaps that Mr. Franklin was predisposed to sell marijuana. I conceded that in my opening statement to the jury. There was also evidence in the Instagram communications and the wiretap communications that he was predisposed to sell oxycodone or Percocet. Air quotes around Percocet. However, there was no evidence, and Agent McElway, the investigating agent in this case, conceded that Mr. Franklin had ever trafficked in cocaine at all. There was no evidence in the Instagram statements. There was no evidence in the Title III communications. Mr. Gooch, the cooperating informant, testified this ain't his forte in reference to cocaine. And so as you go through the facts, and again, the only thing that's incumbent upon the defendant to do in this instance is to present facts which would support the instruction, and then the trial court is required to give it. So Agent McElway testified at trial that in appellant's communications, he didn't have any conversations with anyone about cocaine or heroin. The Title III intercepts I've already mentioned. There were exhibits on those Title III intercepts that were used by the government, Exhibit 288, where he referred to drank and tech. That's not cocaine, according to Agent McElway. Drank, which is the codeine, cough syrup, perks, marijuana, several instances of marijuana, nothing to do with cocaine. Evidence was he didn't participate in the sale of cocaine to any person. Mr. Gooch, the cooperating informant, testified he had only ever bought marijuana from the appellant. And he stated to the case agents on a consensually monitored recording, this ain't his forte. And that's Transcript Volume 5 at 885 and 886. You know, I think if I were the district judge, I think I would have given an entrapment instruction because it was a different drug. But that's not the question on abuse of discretion, standard of review. And our more recent cases seem to allow exactly the type of finding that the district court made here. And therefore, to decide as a matter of law that, hey, you were predisposed to criminal behavior of the same type. And therefore, you don't get an instruction. And I don't know what to do with that case law. And so what's your response to that? Well, Your Honor, there is that case law exists. I would concede that that case law exists. I'm asking this panel to do something different. There is case law from other jurisdictions that I cited. The government is not free to induce more serious crimes simply because the target already committed a lesser crime. The sentencing, and that's United States v. McGill from the Seventh Circuit, is not, and I quoted in my reply brief from the Eleventh Circuit, approving jury instructions permitting the jury to find entrapment to some but not all charged crimes. United States v. Mitchell out of the Sixth Circuit, again cited in my reply brief for the same proposition. Counsel, can we decide that cocaine and marijuana are not of the same type without overruling our own precedent? I suppose you can, Your Honor. I'm tracking with you. I'm having a hard time summoning. In other words, the precedent says if it's of the same type, you don't get the instruction. Can we conclude that cocaine and marijuana are not of the same type? You can, absolutely. And that's borne out, Judge, by frankly for various policy reasons out there, which include the fact that marijuana has now been rendered illegal in a great number of states and cocaine has not. Congress imposes much more serious penalties for trafficking in cocaine and crack cocaine in particular and does not treat marijuana the same way. There's a movement afoot right now in the form of bills pending before Congress that would take marijuana off of the schedule of listed substances. And so not that that's passed, but that is a principled reason to do so. Your Honor, I see I've got about nine seconds left, and I want to be respectful to my colleagues. So unless there are further questions, I'll save the rest of my time. All right. Thank you. Thank you. Ms. Hastie? Good morning, Your Honor. May it please the Court? Your Honor, I have four points of contention in my appeal. I'm going to start with the point of appeal that the government has conceded on, which would be that the district court erred in applying a two-level enhancement for a firearm possession while he was also convicted of a 924C. Since they've conceded on that, I was going to move forward to what I believe is the main issue on appeal. I believe that a statement that was made in the case was improperly admitted, and this would be my second point of appeal. I'm sorry, first point of appeal. In the trial, there was that this is a drug conspiracy matter, and there was a statement by Codefendant Roy Franklin to the confidential informant of Mr. Gooch. And in that statement, he claimed that Codefendant Duncan had told him or called him and said that there were two people outside of his store and believed that they were trying to kill him. And per Mr. Franklin, Mr. Smith and himself and another individual whose name started with R arrived at the store and a shooting incurred from that. The problem is that this is clearly a hearsay statement, but is it an exception to the rule? Is it in furtherance of the conspiracy? And my argument is that it is not in furtherance of that conspiracy. In the situation where it was a drive-by shooting situation, there's nothing in the statements that were relayed from Mr. Franklin to Mr. Gooch that drugs were involved at all. It could have been a statement made because he believed they were about to rob the store, or maybe there was some type of a love triangle vendetta. There's a million other reasons that could be part and parcel for this particular shooting that did not involve the drug conspiracy. There's nothing in the evidence that would show that the situation was part of the drug conspiracy or that there were any objectives that were being furthered by this particular statement. It's also a statement that was made after the fact, so there's some also case law that talks about if it's a statement that's just notifying the listener of some past events, then it is not a statement that is part and parcel of the conspiracy or in furtherance of the conspiracy. I would focus on the two cases that I focused on were Snyder and Krulwich, and in those two situations the court did find that the statements made were hearsay statements and that they were not in furtherance of the conspiracy. The main issue to focus on those is that just because it is a hearsay statement that wasn't properly admitted, is it in fact a situation where it's harmless error? Did it make a difference? And in the case of Mr. Smith, I would say it absolutely made a difference, given that some of the factors are what are the other corroborating evidence that would assist in finding him guilty of this. There really wasn't much. In this particular situation, the statement from Mr. Franklin to Mr. Gooch was the only thing that really put Mr. Smith at the shooting. They did cast data and cell phone pings, and in those cell phone pings, his phone actually pinged at the Kensington residence and not at the situation with the shooting, and so he's not even placed there by his own cell phone. They... Can I ask you about the furtherance part of it?  Which is maybe it takes a little work to get there, but I wonder whether some of these statements could be almost like a part of training somebody to be part of the conspiracy. I think there's evidence they were teaching him to cut heroin and some other things as part of the conspiracy, and could you make a story that, and maybe this is what the district court was thinking, that, hey, we're showing you how we roll, basically. Like, when one member of the conspiracy is in harm's way, all the members of the conspiracy come, and so we're teaching you how we defend each other and what we expect from you as part of the conspiracy. I just throw that out as a possible rationale. Right, and I do understand that it's a possible rationale, but there was nothing in evidence to show that that was actually the case. There was nothing to say that we're going there to support our friend who helps us in our drug deal. There's nothing to say that these guys were possibly there because they were mad about a drug deal gone bad, or we really don't have any clue why these guys were there. They could have just as well been casing the store for robbery as been part and parcel of the conspiracy for the drugs. There was nothing in evidence anywhere that ties it to a drug conspiracy. Does that matter, though? I mean, does it matter what the other people were intending to do if, for example, the members of the conspiracy actually thought that somebody was there to steal drugs or whatever? In other words, even if they were casing the joint, you would perceive it as being related to the conspiracy. I think it does matter because the charge is a drug conspiracy and not a RICO charge. I think if this was a RICO case where they were charged with that, then any violence taken part and parcel with the members of the group would be admissible as furtherance of that conspiracy. But this is a drug conspiracy, and given that some of the case law specifically delineates the two and puts the violent acts in a RICO and drug acts in the drug conspiracy, I think it's a slippery slope to then take every single violent act in a case that's not a RICO case and put it over with a drug conspiracy case and allow what would be an admissible hearsay due to it being in furtherance of. If the statement from Mr. Franklin is not admitted, then I believe there's not sufficient evidence, and that is the next point that I had on appeal, that there's not sufficient evidence to then convict Mr. Smith of the shooting and the conspiracy to possess the firearms in connection with that shooting without that statement from Mr. Franklin. So my contention is that it was error of the part of the court to allow that. The next point that I had made was the admission of some rap lyrics. I fully briefed those. I'm down to 17 seconds, and I really don't want to take away from my co-counsel, so if there's no other questions, I will sit down. All right. Thank you very much. Mr. Pickett will be appearing on video this morning. Can you hear me all right? I can, Judge. All right. I appreciate the panel. You'll have seven minutes of time, and I'm not sure if you can see the clock. If you have questions on time, feel free to ask. I can see the clock, Judge. Thank you. Sean Pickett on behalf of Gary Toombs, the appellant in this particular matter. I appreciate the court allowing, because of my flu illness, to appear virtually very much so, and I'm slightly embarrassed that I came down with the flu. I have four points on appeal. I want to try to, in the time that I have, address two points, points one and point two in my briefs. First, the trial court erred in submitting Mr. Toombs' appearance to the jury in any capacities, in that there was no reasonable inferences evidentiary to go forward to the jury, based on the fact that approximately eight different exhibits in the three-week trial were attributed to Mr. Toombs, and in those, I would summarize that, generally, they were inquiries into purchasing marijuana, and at the very best, in light of the government, if you're looking in light of the government's case, or in favor of what was submitted before the jury, perhaps a question or inquiry about black ops, which, although we're not conceding was heroin, that there was some conversation about that. Those inquiries under the case law that I cite, which the main case and the controlling case is Anderson from the Tenth Circuit, but Boykin is the Eighth Circuit case, both those cases show actual purchases of defendants who were later found to not have joined the conspiracy, based on their involvement with just purchasing or possessing, and in this particular case, Mr. Toombs, the trial court erred in Mr. Toombs' allowing the government to infer from the minimal evidence that Mr. Toombs' inquiries were knowledge and joining a greater heroin conspiracy, which is what he was convicted of. There's no evidence that he inquired about heroin, except for the government believing that his term of black ops has to do with heroin, which their agent, Makawe, their agent did not indicate that black ops has anything to do with heroin. He says black does. On those points, and Boykin, the leading case, indicates that the judge should not have admitted or should have ruled on the acquittal motion that was made prior at the end of evidence, and seeing that Mr. Toombs, at the best, was a buyer purchaser of marijuana, even though there was no direct evidence that he ever purchased marijuana. There is a PolCam camera that has no real determination of all the weeks that he was on the PolCam one time and had no comings and goings, showing knowledge of a conspiracy out of that to sell drugs of any kind out of that residence, and therefore alleging that there was something in this being allowed to be inferred that there was something in his coat that was illegal when it doesn't purport, and if you look at the evidence, look at the PolCam, it doesn't necessarily purport that there was anything in his coat. They're just alleging that there was, and it could have been a fold in his sweatshirt underneath. It could have been nothing. It could have been a puppy, as we cite in our brief. However, judges, for all of those reasons, there's lack of evidence of the conspiracy that he was convicted of, of heroin, and for those reasons, I believe the court erred in submitting Mr. Toombs' charges to the jury and allowed them without, which gets me to my next point, my second point, that he failed to give a buyer-seller instruction or a theory of defense. Counsel, before you move on, I wanted to ask you about the drug premises. My understanding is that Toombs was the one who actually rented the premises, and I just wonder whether the fact that he was there on a regular basis and had rented it, whether that alone is enough to attribute the fact that he must have known what was going on in a house that he rented, and if not, why not? It is not, and the evidence does not show that he was there often. The evidence shows that he took over the rent for a girlfriend so that she wouldn't get an eviction on her record, and that he wanted to use the outside garage to work. He's a mechanic. He wanted to use the outside garage area for working on cars. That was his intention. There's no evidence that he actually worked on cars or was there other than two instances, one where he was shown on someone's Instagram social media account where he was at a party in the residence with no guns or drugs or anything on that social media post, as well as the poll camera, and I believe one other time when he picked up the rent. So I do not concede, and I don't believe the evidence shows that he was there frequently, and for all those purposes, Judge, I do not believe that him renting it as an absent landlord would give him knowledge of a conspiracy there, nor was he, or nor was that enough evidence to show that he joined any conspiracy for whatever may or may not have been occurring at that residence. In the last 10 seconds, I would just argue that Boykin and Presscorn point that a buyer, if you assume the inferences were correct and that the judge submitted it, that at the very least he had a right to a defense instruction of a buyer-seller agreement so that the jury didn't have a roaming commission to just have one option to convict him of what was submitted by the government. I see that my time's up, and I want to respect Josh's time. All right, thank you, Mr. Pickett. I just want to thank you for appearing today despite your illness, and I want to assure you that the court was able to see and hear your argument very clearly. Thank you very much, Judge. All right, Mr. Adams. Thank you. May it please the court, Joshua Adams for David Duncan. I'd like to reserve a minute for rebuttal. Your Honors, I'd like to respond to one question the panel asked of Ms. Hastie related to the drive-by shooting, and that would be point one of my brief. The panel asked if whether there was this, they were informing Mr. Gooch about what they did and what Mr. Franklin did at the shooting to show this is how we protect people of our conspiracy. And that argument the government has made in its brief, and that's been rejected in the Krulwich case in the Supreme Court, that some subsidiary or implied purpose of the conspiracy would pretty much abrogate the whole exception to the rule. And these are hearsay exceptions, and I think they should be narrowly tailored to specific conduct and specific statutes and what's been charged in the case. And here, Mr. Duncan's charged with a drug conspiracy. And this drive-by shooting, there is no debate that a shooting occurred, right? There's shell casings recovered, Kansas City Police recovered those bullets, there was investigation, there was a car with bullet holes in it, but the question is whether that shooting was done in furtherance of a major drug trafficking offense. And the evidence of that is Mr. Gooch's statement, and it is double hearsay. Mr. Duncan's statement to Mr. Franklin and then Mr. Franklin's statement to Mr. Gooch. And Mr. Franklin's statement is inadmissible both under the co-conspirator exception and under 804b3. The government raises that Mr. Gooch's statement would be admissible under 804b3. I want to touch very briefly on that. The district court did not conduct an analysis under that specific rule as to whether Mr. Franklin's statement would be admissible. And had it, Williamson in the Supreme Court holds that the district court must do an analysis and excise parts of the statement that are not inculpatory to Mr. Franklin. So even if Mr. Franklin's statement is admissible under 804b3, Mr. Duncan's statement is inadmissible under that same rule. That also goes into our second point, which is there was insufficient evidence to prove that the drive-by shooting was done in furtherance of a major drug trafficking offense. Counsel, you heard, I think this applies to the argument you're making, but you heard earlier why I thought it was at least possible that it was in furtherance of the conspiracy. And I wonder if you heard the question, which is that it was part of, you know, introducing Mr. Gooch to the conspiracy and he was in training in terms of how to cut heroin and might have been acting because they wanted to allow him to understand the culture of the conspiracy and what they did for each other. I want to give you a chance to respond. Thank you, Your Honor. Judge, I think that the evidence showed that Mr. Gooch wasn't a member they were bringing into the conspiracy. I know he mowed the lawn at Kensington and he did that in exchange for drugs. None of the evidence presented at trial established that Mr. Gooch was a trusted member of any conspiracy. Mr. Franklin allegedly made this statement to Mr. Gooch shortly after the shooting occurred and it appears he was just informing him of what happened. It is possible, Your Honor. What about the cutting of heroin? My understanding is that the record did show that Mr. Gooch was being taught, being shown, whatever you want to call it, how to cut heroin. They were showing him how to cut heroin, how to, I think the term was step on it, to stretch it out, to make more of it. I don't believe that was part of introducing him to the conspiracy. There was no evidence they trusted him with any weight. They trusted him with delivery or sales. They were just merely showing him how to make it. I don't know what to make of that. I don't believe that's enough to show that he's a part of the conspiracy, though, with the other evidence that was in the record. Although, you know, I mean, I'm referring to sort of what's in the movies, but if you see those big rooms where people are cutting drugs or whatever, I would presume that those people who are cutting drugs are part of the conspiracy. They're essential members. And if he's learning how to cut heroin, I would think that that would at least allow a jury inference that he is some part of the conspiracy. So I think there needs to be more to have that inference and I think if we weigh that fact that one of the co-conspirators is teaching him how to cut heroin without more, or if we balance it against this other evidence that they have him cut their lawn and that he's really just someone there that they give some bags of heroin to once in a while, if anything, he seems to be a customer or an addict that they're trying to, I think, hook in. And I think there's an equal inference each way and I think that that creates reasonable doubt and that shows that there's insufficient evidence that the statements were made to further the conspiracy or that it's evidence that the drive-by shooting was done in furtherance of a drug trafficking offense, as the statute requires. If there's any other questions on that, I'd like to move on to my third point, if that's okay. And that's the introduction of rap lyrics in this case and it's our position that those were inadmissible under Rule 403 as they showed merely just bad character and they tried to put the defendants in a poor light in front of the jury, especially Mr. Duncan, and then when they introduced other evidence that, hey, there was a shooting, well, Mr. Duncan must have been a participant because look what he raps about, look what he sings about. And I think there are cases that show that rap songs, rap lyrics, hip-hop is traffics in hyperbole and traffics in outlandish and boisterous and very violent imagery, merely to sell records, to sell songs and to get views on the internet. So that alone would be insufficient, I would say, to introduce into evidence as proof of a drug trafficking conspiracy. Mr. Duncan didn't write any lyrics or songs related to any specific conduct in this case or related to any actions that he is accused of. If there are any questions on that point. Yeah, I may ask Mr. Hurst about this, but I wanted to follow up on the rap lyrics and videos. The government argues that any error here was harmless because they produced what they refer to as copious amounts of other evidence. It seems to me that sort of cuts against saying that the probative value of this evidence outweighs its prejudicial effect. If it's not necessary for the conviction that its probative value must be near zero. I would agree that there is no probative value of introducing music that Mr. Duncan provided. And especially the harm here is for counts six and seven, which was the drive-by shooting offenses. Because you introduce this evidence that Mr. Duncan is selling drugs and making drugs, in song, not as fact. And then you show the jury evidence that a shooting occurred and you say Mr. Duncan was involved in it and you introduce this statement. I think the cumulative effect is extremely prejudicial to Mr. Duncan. And it has no relevance because the songs the government introduced did not point to specific conduct for Mr. Duncan in this case. Well, I kind of wonder, just to follow up, even on the underlying rap lyrics themselves. You know, music sometimes reflects real life, right? People write poems about what they're doing in their day job. People write books about it. People write rap lyrics. There's a lot of stories about people writing songs about their high school lives and things like that. My question for you is why isn't it relevant to show that? With telling people that, yeah, this is also a form of song and doesn't necessarily reflect what they did in their true life. But, you know, it came out of their mouths. It came out of the conspirators' mouths. So one would think it's like a confession. So... Oh, I'm sorry. No, go ahead. So I would say, Judge, that if the songs that Mr. Duncan produced and the government played for related to specific instances or specific conduct that could be proven at trial, I would agree. But that's not what happened here. They have music where Mr. Duncan is literally sitting on a video of him sitting on his bed watching himself on TV, and it's a different persona. So I think the whole point is showing a different persona, not embedded in reality. And I think the problem with that is then the jury is left to speculate. And in a criminal case, I think speculation is extremely dangerous. Well, I just wonder because, I mean, if you're talking about dealing drugs, of course you could always rap about something else. And I don't know exactly why. I forget what the exact words were in the rap. But I guess the point is it feels a little like a confession. If you said the exact same thing to police, it would certainly be admissible. If you say it in a rap, it feels like we have a different rule or a song. We have a different rule. Why is that not true? Well, I think art and music and art forms are definitely different because they portray a different persona, portray a mood or a feeling. My argument was always that no one thinks that Bob Marley shot a sheriff. No one thinks Eric Clapton shot a sheriff. It's a song, and no one investigated either of those writers for a murder. So I think the point is that Mr. Duncan is rapping about songs that people would want to hear about. No one wants to hear about him going to school or paying his bills. I see my time is up if there's no other questions. I would just ask the Court to reverse and remand for a new trial. Thank you very much. Mr. Hurst. May it please the Court, Ben Hurst of the United States. I think I'd like to start with the I'm actually going to start with sufficiency on the drive-by. I think it logically follows. We'll talk about hearsay, take that question that were raised by defendants Duncan and Smith together, and then move on and tackle the entrapment, the rap lyrics, and Mr. Toombs' contentions. I think there were two ways in which the jury could infer that the drive-by shooting furthered the drug conspiracy. The first one was protection, protection of a valuable member of the conspiracy. I think the way to think about this, and it goes to a question that the Court had earlier, is that was there a particular drug transaction discussed? No. But was this charged as drive-by shooting in furtherance of drug distribution, a substantive count? No, it was charged as further conspiracy. The conspiracy is that the agreement, it went out through this entire period of time. In fact, it was still going on at the time of the takedown, nearly a month later. So the conspiracy is an ongoing agreement between these defendants to distribute drugs. In an analogous situation, you might say, a company or an organization or a partnership might take out key man insurance, key woman insurance. That is, insurance for a particular person who is integral to that operation of that organization. Now, this isn't specifically insurance, but protection of members, other members of the conspiracy has the same effect. That is, while we're concerned about the loss of a particular person to the operation of the conspiracy here, we know. Duncan, I don't hear them challenging that there was a conspiracy and that he was a pivotal member of it. We know that he was depositing large amounts of cash, that there was a substantial number of pills, firearms found in his apartment. So these are important. He was an important member of the conspiracy. It is as if they were taking out insurance. Nobody would say that when a company takes out insurance on a key CEO, a sports team takes out insurance on a pivotal member of its team, that they're not doing so in furtherance of the broader goals of that operation, whether it's to win football games or whether it's to make money and improve your share price for your shareholders. Now, here we don't have the same situation, but this is not like a regular operation. They can't call police when they need assistance, when they're in danger. Here we have – and, in fact, we've seen this, and it's almost in a cooperative way. So in an earlier situation, there was a shooting of Martin Garner, whose name was Looch, nickname was Looch. And there was a retaliatory – a discussion of retaliatory action and some concerning things that were seen on the poll cam. So there was an intervention by police that resulted in a high-speed chase. During that high-speed chase, Smith and another defendant who wasn't in this – as part of this trial were running from cops in a car, and there was a phone call with Duncan, and Duncan says, what can I do, what can I do, what can I do? Well, that's Duncan performing his end of the insurance contract, the protection part of this operation. And that turnabout was fair play. That came back to him. When he was in trouble, he was at his store. There were two men outside his store who he believed were there to kill him. Other members of the conspiracy jumped into action. And I think it's important to think about how closely tied that action was to the conspiracy itself. They were driving in a black Jeep. That black Jeep was a Jeep that Smith was driving at an earlier controlled buy. They left from the trap house. The trap house, which is where we found 295 grams of heroin. A number of guns, the guns that were used in this shooting, were there. It's only three miles away. It's practically in their backyard. They left from there. They went to do the drive-by shooting. They came back to the trap house. They pulled behind, and that's where they decided to hide the evidence of the crime. All of these things show that the tie between the conspiracy and the drive-by shooting was very tight, and so the jury was permitted to draw that inference. I heard another argument, I think it was in some of the briefs as well. Well, there might have been multiple reasons. It might have been self-protection, a love triangle, or there was a robbery about to be planned. I don't think that's supported by the evidence. The evidence was this was Deej's store, so that's just not a plausible interpretation of what happened. But I think even there, this court said in flax, well, look, the jury's permitted to draw that inference one way or the other. You can draw it as intent to further conspiracy and not as intent to do some kind of protective action because of bonds of affection or filial relationship between these two. Let me ask you, so you've been talking about sufficiency, which is fine. That's an issue in the case, but what about the statements to Gooch? Sort of a lot of the same argument, but you heard opposing counsel say, no, it doesn't suffice, that was admissible because it wasn't in furtherance of the conspiracy. Certainly, Your Honor, and I think for the same reasons. It builds on that set of arguments, but I'll take up a question that Your Honor posed earlier. What about training? Certainly, they were training him by cutting heroin with him there. There's a video of that going on. I think there's even testimony from Mr. Gooch that prior to another incident, he had not really been respected by Smith. The other incident that I'm referring to is a shooting that involved not Smith but Smith's vehicle where his phones were in the vehicle after the shooting and they induced Gooch to go and get the phones from Dog's car. That was part of an act that Gooch undertook to benefit the conspiracy and I think it indicates that in addition to training, that he was performing kind of clean-up operations for them when things went bad. That's very similar to what happened in this case, which is Franklin came back and immediately told Gooch what had happened. And Gooch, in fact, at that point called the FBI, took photos of the Jeep. That's how we found out about the drive-by shooting. That earlier action is consistent with the premise of Your Honor's question about training and about bringing him into the conspiracy, into the fold. I think there's ample evidence from which, not just that the jury could have found that for purposes of sufficiency, but also to support the judge's exercise of discretion and permitting that evidence in under 801-D, the co-conspirator exception. So absolutely, I think that that, and just to respond to one point, I think it's clear that while Mr. Duncan's talking about double hearsay, obviously as to him, his statements are statements of a party opponent. So he talks about double hearsay, but just to be clear, what we're all talking about is Franklin's statements to Gooch. So I think those statements can easily be taken in furtherance. I don't think the judge abused his discretion in admitting them on those grounds. To take one further step, I think all of those statements were admissible under 804-B3. I understand that there wasn't a finding on that, but that issue was put before the district court. And if the court looks at Williamson, it doesn't say that if those findings aren't made by the district court, that they can never be used at all. What it says is, well, the findings weren't made by the district court, we're going to send it back to the Court of Appeals for them to sort it out. And in a case cited by opposing counsel, Hazlitt, this court said we're not even going to send it back to the district court to sort out this Williamson question about whether the statements were inculpatory, exculpatory, we can do that, they're in the record. I'd submit they're in the record here. In fact, I would submit that the statements themselves are all inculpatory. Duncan told Franklin and Smith that he was about to be shot. There was an implied request to come to his aid. Franklin's retelling of how he committed a drive-by shooting with Smith is obviously inculpatory. There's no statements in there, and in fact, defense counsel has not even identified any statements in there that could plausibly be excluded as non-inculpatory. They're all about crimes he committed. This isn't the scenario where he's talking to police, he's minimizing, he's trying to put blame on someone else, and some of those statements have to be excluded. I mean, all of the statements are admissible on those grounds. And so it was put before the district court, and the district court admitted them on a different basis, but this court could easily affirm the district court's ruling on the 804b3 and a portion of that. Kraluj was cited to the court. I think that case is very distinguishable. The Supreme Court was making a point about how the conspiracy was completely over at the time the statements, the later description of what happened, had made. That's obviously not what was going on here. The conspiracy was ongoing up until the moment of the takedown on October 2nd, some three weeks later. There was some discussion, I just want to clear up one point, about the phone pings, the cast report. I don't take defendants to be seriously contending that Franklin and Smith did not actually commit this drive-by shooting. The evidence of Franklin and Smith's commission of the drive-by shooting was overwhelming. There's poll cam footage of them driving backward and forward. There's them loading up the car, the shot spotter, recordings of the shots going off. The fact that the car was returned to their trap house with the back window blown out of it. The back window was found at the scene of the crime. There were casings in the vehicle and casings at the scene that matched guns that were found at the trap house. You can see on the poll cam footage, a person driving the car is wearing yellow gloves. The yellow gloves were found at the trap house. I don't take that to be a serious contention in this case. It's just about whether the drive-by was in furtherance of the conspiracy. In any event, the way that phone ping evidence actually came in is that it was an abnormal call and that no conclusion could be drawn from it whatsoever. I'm actually going to move on from the drive-by and the hearsay. Most of the court has additional questions about that. I heard from Ms. Smith a suggestion that we conceded on gun enhancement. We conceded that there was error in applying it. We don't concede that it was harmful error. We think the court should just affirm the sentence there. I want to make that quick point. The court said it was going to apply the same sentence regardless of what the guidelines were. It gave it a reasoned analysis. The way the court sentence is stacked up, it's clear that it was thinking in terms of the evidence that it heard and all the factors under 3553A. Thank you for that clarification. It was my understanding that you're saying that it was harmless error. Yes, it's harmless error. I would like to move to the entrapment issue. Certainly. We have 14 issues, but time is starting to run a little bit more. In terms of entrapment and the issue of predisposition, at what level of generality are we to look at predisposition? Are all drugs the same? If someone is predisposed to sell drugs, does it matter whether it's marijuana or whether it's fentanyl? At what level of generality are we supposed to interpret this predisposition case law? Fair enough, Your Honor. I think we have cases where we have, not from this court, but that we have cited where there was a marijuana and a cocaine and the marijuana convictions were relevant for purposes of predisposition for the court. That's my recollection. I don't want to swear that's exactly how it went down. What about in a case such as this one where there seems to be evidence that he had a predisposition to sell marijuana but not a predisposition to sell cocaine? I do want to clarify one point on that, Your Honor. I've heard this. I believe the statement was, no evidence he had ever trafficked in cocaine at all, which is true as far as it goes, but it is absolutely the case that there is evidence of prior drug transactions in cocaine by Mr. Franklin. That evidence was not admitted at trial, but a proffer was made for purposes of entrapment by the government. The proffer is at 2022. There's a video during a buy where there's a discussion about driving around busting serves with another defendant. That's why the evidence was kept out. Not kept out by the court, but it was an agreement between the government and another party not to introduce that. But I would say this to the court. If this case were to be sent back for trial on cocaine, that's evidence the government would seek to introduce, and I think that absolutely should be predisposition. It's our view here that there's no inducement. Mere solicitation by the government isn't inducement, so we don't even get to the question of predisposition from our perspective. Didn't they specifically offer him a finder's fee specifically to find cocaine? Certainly, Your Honor, but all drug traffickers work for compensation. This is not an arrangement where he would do this for free. The fact that there is compensation, a $200 finder's fee was not exactly exorbitant. But it wasn't just a fee. It was a fee specifically to locate cocaine. To broker a cocaine transaction, but that's just the reward that's incident to the crime. That's not specifically evidence of inducement any more than solicitation. It's just what you get for performing the crime. In any event, the predisposition, I just point the court with respect to drugs versus drugs cases, Dennis Simtob cases from our brief where these multiple drug, different kinds of drug circumstances came up. I would also point out one additional, and this argument has always been a bit confusing to me because it's hard for me to see how Mr. Franklin benefits even if he's successful. He was convicted of conspiracy with respect to three objects, which is oxy, marijuana, and cocaine. Even if he, the court said... Is it codeine? Is it codeine? Your Honor, I hate to have misstated that, but I'll take Your Honor's word for it. It's in the record. The relevant point is it's a C level. The cocaine was also a C level. So even if there were an entrapment instruction required, and even if we went back and retried the case and we introduced this evidence, which we believe is very clear on predisposition, and even if he somehow got an acquittal, it's hard to see what benefit he could get from that because he would still have the conviction for the 846, 841 for marijuana and whichever it is, oxy or codeine. It's just completely slipped my mind. And the statutory range is the same. And the court said that the guidelines range wouldn't have affected its decision. So it's just hard to see how he could get any benefit from having that instruction. So in our view, even if we don't think the instruction was appropriate, we think that the district court didn't abuse its discretion in refusing it, but even if he got it, it seems like it was harmless at best. Turning to Melissa Gore's additional questions on entrapment. Let's talk about the rap lyrics and videos if we could. Certainly, Your Honor. I guess from my perspective, this evidence was clearly relevant and therefore generally admissible. Where I have some questions is on its probative value. As I understand, you've said in your brief that, well, if there's an error here, it's harmless because the government has introduced copious evidence to prove everything that was proven by the rap lyrics and videos by other means. Doesn't that necessarily mean that the probative value of this is extremely low? And so when we balance the probative value against the prejudicial effect, if you have a featherweight on one side, it doesn't take much to outweigh it. I wouldn't agree with Your Honor's premise. I think that the probative value of this evidence was very high. Other evidence we had was also extremely probative. The other evidence was extremely probative, probative of their violent tendencies. So you're saying that it's cumulative but still probative. Absolutely, Your Honor. Absolutely. We have many, many, many other things. The evidence was overwhelming. But this evidence was valuable evidence and was properly admitted. Doesn't that ultimately affect its probative value if you've proven the case by 10 other means and you've got another means that does the same thing but it's highly prejudicial? Well, the issue, though, Your Honor, is that the district court is making this decision before the verdict is rendered. So the district court is saying, what's the probative value among the other evidence that's here? It's looking at the other evidence. It's looking at this evidence. When we get here, we have a verdict. We can look back and say, well, sure. Obviously, we think that this didn't have a substantial effect on the verdict. We meet Kodiakos' harmlessness here. But that's not a question that's before the district court. The district court has to decide probative value. Is it substantially outweighed by the prejudicial effect? Now, here, the prejudicial effect, there's a lot of prejudice for this evidence. It's extremely inculpatory. But the question is, was it unduly prejudicial for any reason? And here, I've heard a reason why it was unduly prejudicial. And moreover, there were instances, I believe, of lyrics about other crimes that were not the subject of this lawsuit. There were also lyrics about the crimes that were subject to this conspiracy. So for example, I heard Mr. Adams say, this doesn't relate to anything in reality. I'm paraphrasing. I don't want to misstate what he said. But in fact, I just come to mind two different statements that were highly relevant to this conspiracy. There is a statement in one that says, N-word, shot at Looch, he's got to pay. There was retaliation. When Looch was shot at, Martin Gardner was shot at, there was a high-speed chase that followed from fire intervention. Because of the shooting, there was a wire call that was intercepted, and there was a mitigation because they thought it was going to be retaliatory. They were loading firearms into a car or something. That's highly relevant to the conspiracy. It exactly describes what happened. And then there was another statement. You're going to bleed if you ever lay a finger on Deej. That's highly relevant to the motivation for the statements being made, but also for the drive-by shooting itself. So to say that there is no reality in these rap lyrics, it kind of ignores how closely all of these rap songs describe exactly the lifestyle that they were living. In fact, I think I pointed out one of these rap videos was, in fact, shot at the trap house. So the evidence there, I mean, there's codeine being consumed, or the inference from the rap videos, the codeine is being consumed. So I'd say the rap lyrics were extremely probative. That they were cumulative doesn't make them less probative. But the prejudicial effect that was undue was limited. There was a very short amount of excerpts that were introduced. I think it was something like 12 minutes in a trial that took 13 days. Might it be, and I wonder whether the way to look at it in terms of Judge Groz's opinion, or Judge Groz's question, excuse me, is that it's confirmatory. So let's say you have overwhelming evidence. You found the drugs on somebody. You've got him on camera selling whatever. I mean, keep going on and on and on. We have some of that in this case. But there's something about hearing it from the defendant's mouth saying, yeah, I did it. And I understand this could be artistic. It could be rap music. It could be boasting. It could be telling a story that isn't there. But I wonder if because it's different in kind, that sort of suggests that maybe it's not unduly prejudicial. Or maybe the better way to put it is the probative value is higher. If you had a confession that was non-rap music, and then you had a rap music confession, then maybe at that point it's not very probative. Because you have an audio of him confessing. I don't know. I'm just throwing that out. But I wonder if that's a way to look at it. I think there's a lot to that, Your Honor. I think that there's a qualitative difference. I think that the rap videos also had, they were probative in another way, in that they showed an association between the defendants, put them at particular locations. Like Kensington, there are vehicles involved. So that is probative in a different way than Your Honor's positing in your question. But I think is another way in which these videos came in and were relevant, probative, demonstrated guilt. But I don't think that undermines the government's harmlessness argument at all. And if they were ultimately- Let's split hairs a little bit. What about the portion of the rap lyrics that pertained to potential crimes that were not the subject of this prosecution? I believe a shooting, perhaps. What's the probative value of those lyrics? I'm not familiar with what the lyrics to which Your Honor is referring. I think they're alleging that there were other lyrics dealing with potential crimes that were not the subject of this prosecution. Your Honor, I don't recall exactly how the briefs went down. I believe there was one reference to a rap lyric that was not actually introduced at trial. That one sticks out in my mind. I don't want to- Assuming that there were non- It's just hard for me to imagine, because here the conspiracy was a drug trafficking conspiracy. And there was an awful lot of violence that was undertaken as part of the conspiracy. It's just hard for me to contemplate without an example coming to my mind what lyrics it would be that wouldn't have come in. I will say this. An awful lot of those rap videos were excluded. I mean, were not offered by the government. They were cut down substantially. I spent entirely too much time watching those videos, Your Honor. They're very short. There's 30-second clips here, there, and everywhere that were specifically tuned to the conspiracy. And in fact, Your Honor, when the court ruled on this, it gave a list of 10, 11, 12 different ways that those were probative. I think that that was a correct resolution of this issue. And I think that it certainly wasn't an abuse of discretion that would require reversal. Let's just suppose, without getting into specifics, suppose that it said, the rap lyrics said, I killed 40 people. And that wasn't excised out. And there's no evidence this person's a serial killer. Do you think that that, to get to Judge Graza's question, do you think that would pose a problem? I think, Your Honor, if that were, if there were no additional limitation, we just had, I killed 40 people. Well, in addition to selling drugs, which is essentially the prostitution. Certainly. Perhaps, perhaps. I mean, I think if I killed 40 people was within the scope of the conspiracy, time-wise, temporally, I don't know. I mean, that would be a tougher question than the premise of Your Honor's question, where it's just kind of in space, you know, unconnected. I killed 40 people when I was in Vietnam. Well, that's probably going to stay out, right? It's hard to see how, you know, I mean, I think I could come up with a hypothetical where it would be excludable. But if it's not part of the conspiracy, I mean, that's highly prejudicial. Because if they think, if the jury thinks there's a serial killer sitting in front of them, in addition to a drug dealer, chances are they're probably going to be a victim of drug dealing, if there's any way to do that under the evidence. I don't think I would, I don't think I'd disagree with Your Honor in that case. Because it seems like, because of the lack of relationship to the conspiracy, there'd be some kind of undue prejudice here. I don't think that undue prejudice exists in the evidence we introduced here. That's a different animal altogether. Mr. Toombs' arguments. We've got four minutes here. I am, I just point the court to several pieces of evidence which I think resolve these questions. Both the buyer-seller and its efficiency. The, Mr. Toombs was, in fact, there is evidence, I did want to point out, there is evidence that Mr. Toombs was frequently at the Kensington house. The case agent was specifically asked that question and affirmatively answered that he was. There's a video of him at the house. There's the video, a separate video of him walking out of the house with a large bulge under his shirt, which the jury could easily have inferred was the same size and shape as a one-pound bag of marijuana that the government introduced at trial that had been purchased in one of the controlled buys. So that, his tie to the Kensington residence is more than just that he rented it. It's that he rented it, he was frequently there. And just note, there was at the end, there was not just pull cam footage of defendants moving in and out of the house all the time with guns. There was security footage recovered during the takedown that showed them, not Toombs particularly, I just, I want to make the point that defendants were never hiding what was going on at the house. They were there in plain sight walking in and out of the house on the pull cam footage with firearms It would be very difficult to be in the house given that evidence the jury could infer and not see what was going on. And so I think tying him to the house, the lease of the house, his knowledge of what was going on there, that would be sufficient. I think that was a question your Honor asked. But I think there's additional evidence here. The picture of him with the one-pound bag-sized bulge under his shirt, conversation where he's negotiating to purchase eight ounces of marijuana. I know that in the defendant's reply, Reif says, well, different courts have said that that's a user amount. But the evidence in this case was that that was resale. More than two ounces was resale. Another conversation where he's at Kensington negotiating with Franklin to purchase drugs in the kitchen. And then the conversation where he says, I'm trying, I've got some plays that are going to land. I need you to get me in touch with Dog. I want to talk about black ops. The jury could have inferred from the evidence that was there that that was a discussion about heroin and about the desire to get in touch with Dog, who was a heroin dealer, to arrange for the purchase of some heroin. So I think the evidence was sufficient. I think the judge properly rejected the buyer-seller instruction, which is just a single transaction for a personal use amount. That's completely inconsistent with the evidence and what the judge did here was absolutely appropriate. I don't have any additional responses to the questions that were raised. I've used almost all of my time. I'm happy to answer additional questions, but if there are none, we'd ask the court to affirm the judgment of the district court. Thank you. Is there any time remaining for rebuttal? Let's set the clock for two minutes, please. Mr. Adams? Thank you, Your Honors. I would like to address a statement the government made in its presentation. They said that the rap lyrics showed the group's high violent tendencies, and I think that's the real danger here is that it's going to show this propensity to commit violence, and then when the government introduces evidence that a drive-by may have occurred, here is a statement from a confidential informant. The jury is going to convict not on the evidence, but on this tendency to commit violence based on music and based on lyrics. Touching on what Your Honor said, there is one song in relation to Mr. Garner where he was shot at, and there's lyrics about that. That's related to a historical event that was, I think, widely talked about among the group, so it's not as if this is something that they're agreeing to do or confirming their membership in a conspiracy. It's merely repeating something that all these people who knew each other in the first place were talking about. In relation to Mr. Duncan, he did not visit the Kensington address. I believe the evidence showed one time he showed up there in the summer, I believe of 2019. He was not a regular participant in Kensington, so showing a rap song or a video shot at Kensington, which I don't believe he was actually a part of, I believe that also shows an undue prejudice to Mr. Duncan under 403. And going back, Judge, Your Honors, to the hearsay statement, we would state that the statement is not made in furtherance of a drug trafficking offense. It's not made in furtherance of that drive-by, so it should have been excluded. And if there are any questions, I would ask the Court reverse and remand. All right, thank you. Thank you, Your Honor. We'd like to thank Mr. Johnson, Ms. Hastie, and Mr. Adams for their service under the Criminal Justice Act. We very much appreciate your service. The case is submitted, and we will take it under advisement and issue an opinion in due course. Thank you, Your Honor. Thank you. The Court will be in recess for 10 minutes, and we'll reset the courtroom and then resume.